Rosewood Care Center v. Price May it please the court, my name is Daniel Maher. I'm here for the appellant, Rosewood Care Center of Swanse. This case comes before the court on a direct appeal from a Department of Appeals Board decision which imposed a civil monetary penalty on Rosewood for failure to participate in the Medicare and Medicaid program participation requirements. The Medicare participation requirements and Rosewood's compliance with them are checked on by Illinois Department of Public Health surveyors who come to the survey or come to the facility and survey and determine whether the nursing home is in compliance with those participation requirements. In May of 2014, IDPH surveyors came to the facility, found that there were immediate jeopardy deficiencies which are the worst deficiencies that they can find for the facility's failure to follow its abuse and neglect policies, for abusing a resident, and for failure to report those incidents to the Department of Public Health in a timely manner. The Centers for Medicare and Medicaid Services imposed a fine for the immediate jeopardy at $6,050 a day for 10 days from May 12 through May 21, 2014. Rosewood appealed the imposition of that civil monetary penalty. It went to an AILJ that works for the Department of Human Services and then up to the Department of Appeals Board. Department of Appeals Board decisions come directly to this court for review. That's how we got here today. Rosewood raises two distinct issues and for purposes of this argument, I want to concentrate on the idea that Rosewood's conduct in investigating and reporting allegations of abuse and neglect were so deficient as to warrant an immediate jeopardy finding. And immediate jeopardy is likely to cause serious harm, injury, or impairment to the residents at the facility. The allegations contained in the statement of deficiencies written by the Department of Public Health surveyors allege three separate immediate jeopardy violations. One is under a tag called F-223, which involves abuse of residents. One is under a failure to investigate the F-225 tag, and one is F-226, which is the failure to implement our policies and procedures with regards to abuse and neglect. CMS's position in this case is basically the three incidents that they rely on show that the facility failed to implement its policies and procedures with regards to abuse and neglect. In reliance on their supposition in that case is that they had three incidents which they consider to be deviations from our abuse and neglect policy and the participation requirements. In chronological order, those cases, the incidents are one, in December, late December of 2013, a resident or a resident's family member reported that the resident's rings were missing at the facility. That was reported on a Friday evening to the facility administrator. He began his investigation of that missing ring incident the following Monday. Did a thorough investigation, contacted employees, contacted the police, and a final report was sent into the Department of Public Health, all as required by the statute. CMS would say his deviation and failure to restart his investigation for that two-day period over the weekend means that we failed to implement our policies and procedures in this case. I understand why you're starting with that particular incident, but I think what's really driving the package of findings here is the incident regarding resident number 34. R34, the resident in the shower, and I'd be happy to talk about that, Judge. Yeah, I mean, it seems to me that's the one that is the main impetus for the Department's of immediate jeopardy. It's clear from my perspective. Well, before you leave the rings, why did Rosewood wait till Monday? The answer, at least from the administrator judge, was that this person was on hospice, families were there visiting, and it may have been an intrusion on them during that time frame. There's no question, though, his delay in two days of investigating was a deviation. Well, I'm sure the family didn't like the idea of his rings being stolen. No one likes that. They would want the investigation started immediately. I don't want to wait a whole weekend. And Judge, I mean, when you have a theft, the longer you wait to investigate it, the smaller your chance of getting this stuff back. Judge, I think the ultimate conclusion of the investigation was that they couldn't tell whether the rings were not. I understand the court's concern, and clearly it would have been better had the administrator came in that night and started that. Right. The question then becomes, is that deviation from our policy actual harm to that resident at an immediate jeopardy? Well, you put it together with a second incident, what you call a CNA incident, yeah, then you're beginning to worry about Rosewood. I mean, the kiss is nothing, I don't think. That's ridiculous. But you have the other two violations, and it's serious, dealing with these decrepit people. I have to be careful with them. No question, our obligation is high to take care of the residents we have, especially Judge, a resident like our third report. Well, you have to pay when you screw up. Certainly we have to pay. Well, you screwed up twice, so you had to pay. So what are you complaining about? But the screw-ups, Judge, that they complain of, they say that's an indication that we failed to implement our policies and procedures in this case. Absolutely. And so the prima facie case they make is, you screwed up twice, that means you haven't implemented your policies and procedures. But our evidence contrary to that is, we in service, first our policies and procedures, both the ALJ and the Department of Appeals Board, both indicated there was no problem with those. So the question then becomes, how do you implement those policies and procedures? Well, our evidence on the implementation of those policies and procedures is clear and you sign off particularly that you understand the abuse and neglect policies and what you're supposed to do. I don't understand how that explains, how that justifies or excuses these two, the rings and this abuse of this pathetic old creature, you know, by the nurse. It doesn't excuse it, Judge. Well, I don't understand, why shouldn't there be a sanction for that? I mean, look, these old folks' homes, they have tremendous power over these people. And of course, it's frustrating dealing with these senile people. But they have to do it properly. And if you don't do it, you ought to be punished. Otherwise, you're going to be increasingly irresponsible. Judge, there's a hierarchy of punishments that a nursing home goes through when determinations are made. The question here becomes... Well, how much are we talking? What's the total here? The total for the immediate jeopardy fine is $60,500 for the 10 days of immediate jeopardy. We were fined an additional $200 a day until we came in compliance with all. And the distinction there is between abating the immediate jeopardy and being in compliance with all participation... So what do you think would have been an appropriate fine? I think the appropriate fine would have been driven by the appropriate analysis... What do you think it would have been? It would have been in the G-level deficiency on the scope of the... Hey, look, I'm asking for a number. What would be, in your view, an appropriate fine? At most, it would have been $3,000 a day for the period of time... Would you give me a number, please? I don't want a day. I don't want a total. $30,000. $30,000. Okay. Thank you. Judge, back to the incident with R34. Clearly, that's the most serious incident that becomes part of this complaint. So, what happened that time, one CNA complained that another CNA was rough with the in bed. That was reported to the nurse. The nurse didn't follow our abuse and neglect policy, didn't report it to the administrator. She did go down and check on the resident and found that he was okay. No harm had been done. So, and I think Judge Kessel and the Department of Appeals Board both said, that means R34 was harmed in some measure. Okay. I agree with that. That's a reasonable inference to be drawn from those facts, if you believe that CNA's statement that that's what happened to that resident. And the ALJ and the Department of Appeals Board both found that. That's fine. But that's not the end of the analysis for an immediate jeopardy determination. On immediate jeopardy, you have to show serious harm or the likelihood of serious harm, impairment, or death to those residents. Why isn't that level of harm implicit if you have a nurse's aide who is physically abusive and the administrators brush it off as a spat between two nurse's aides, which is what the record reflects happened here? Clearly, with regards to that, that's not proper conduct on that CNA's part and it's not proper conduct on that and the nurse's part. Right. And when you have a nurse's aide who has exhibited that behavior toward a resident, it requires immediate intervention, not a brush off. And I think that's what was impelling the finding here. Clearly it was, but the analysis doesn't stop there because the appendix on our brief has the scope and severity grid. There's a level of harm that the department has to show, the government has to show, before they can impose an immediate jeopardy. So they say, here's one isolated incident where this CNA, if you take the allegations as true, didn't act properly towards this resident. What's the actual harm to that resident? There's no actual harm to that resident. And it doesn't depend on actual harm. That kind of standard would not protect patients in these facilities. If she's exhibited this behavior, it's fortuitous that he was not actually harmed, but that doesn't mean that there isn't an imminent risk to other residents, including this same resident, that her behavior will be repeated if it's brushed off and not investigated and disciplined. Okay, but there was a delay in the investigation of that. There was a delay in the investigation of that. The question then becomes, does that go to the level of immediate jeopardy? Yes, it was chalked up to a dispute, just sort of a running feud between two nurses' aides, rather than taken seriously, and that exposes these vulnerable residents to future harm by this aide. Well Judge, there's no evidence in the record, other than this one incident, that that was the problem with these residents. Surveyors there for a number of days, they found no other issue came up. So what's Rosewood's history? Rosewood's history on abuse and neglect is, I think, exemplary, Judge. The CMS Exhibit 8 and our affidavits show that the policies and procedures we have in place, that our people sign off that they understand on, and are constantly reminded on those through the in-service process. In fact, in this case, the very nurses we're talking about, nurses and CNAs we're talking about here, were in-serviced on our abuse and neglect policy in March of 2014, less than two months before the survey. So we did implement the policy and procedure. So what's the efficacy? So you mean Rosewood has never been fined before? Oh, I'm sure we have been fined before, Judge. I've been doing work for him for a number of years. We've never been fined for abuse and neglect, and if you look at our facility history over that four-year period that CMS Exhibit 8 shows, there's no allegations of abuse and neglect there in that whole four-year period. That shows the efficacy of what we do in implementing our policy and procedures. No question our nurse screwed up. No question. The question becomes, does it rise to the level of immediate disproportionate fine to us, given our past history, what we do to implement our policy and what we do to take care of our residents? And I think the analysis should always be... I don't understand what you mean. So after the rings disappeared, was there some new procedure created that if the theft is reported you have to investigate immediately or what? The policy always is, Judge, if you have an allegation of abuse or theft, it has to be reported immediately to the administrator who is the abuse coordinator. He's supposed to start that Yeah, technically he did. He waited until two days. I will say this, though. The minimus nature of that is shown by the fact that we reported that to the Department of Public Health, and in that report it was clear that it was not started on the Friday and not until the following Monday. They never came out and investigated that until they used that to bootstrap the idea that we didn't implement our policy and procedure. Well, it's true, you didn't in that case. It's a deviation from our policy and procedure. So what was there for them to investigate? On the missing ring incident? I'm sorry, I didn't... Yeah. You say it's all clear. It was a delay. So what would the government be investigating? Well, our investigation was, we looked through the linens to see if they were missing there. We talked to staff to see if anybody had missed anything. We looked to see if there were other instances of that. We called the, I want to say the Belleville Police Department, Swansea and Belleville are together, but we called the police department and a thorough investigation was done. And within the five-day period, we sent our final report to the Illinois Department of Public Health and said, we don't know what happened. It's unsubstantiated one way or another, whether this residence rings were stolen or not. So what kind of investigation do you think the government should have done? Well, they didn't do any investigation. Well, what difference does it make? Because it was all laid out what had happened. Well, what would they be investigating? I don't know what they would investigate in that part, Judge. I guess they could go back and interview more staff. They could talk to the Belleville Police Department, but they didn't do any of that. They simply said... Well, why should they? I don't All I'm saying is our investigation and our failure to do it for two days is a minor deviation from the policy that doesn't put any resident at risk for harm. Or is there a likelihood or probability of serious harm or injury in that situation? If only a deviation... So you're saying theft could not constitute a significant harm? It certainly could, Judge. And I thought about this on the way up on the train, and perhaps this hypothetical will help. And I know I'm getting into my time here, but suppose it's not theft or abuse. Suppose it's fair to give medications correctly. So we have a resident that comes in with a kidney transplant, and we fail to give him these anti-rejection drugs. Well, that's clearly an immediate jeopardy. You know, they've rejected the kidney. There's no question about that. But what if the allegations of non-compliance for medication are you fail to give a person his antibiotic for the 10 days that was ordered by the physician? So we miss a day in there. Is there harm to the resident? Well, that's not a stretch to say. If you don't get your medications in a timely manner, that might harm a resident. What if the other is you didn't put the bacterial ointment on a Is that some harm to the resident? Surely it is. Does it rise to the level of immediate jeopardy? No. What if it's you fail to give a medicine a half hour before the person ate, and that causes some reaction, the medicine doesn't work correctly? If the CMS comes to us and says, that constitutes an immediate jeopardy, you're not following your medication error policies, it seems to me we have a right to come to this court and say, wait a minute. Yes, those are deviations from our medication policy, but they certainly don't rise to the level of an immediate jeopardy. No one was harmed. And there's no probability that anybody was harmed. Well, this person who lost her rings was harmed. And so was this unfortunate old creature who was harassed by the nurse in the shower and so on. And Judge, if I agree with you that there are harm, but the missing rings. Well, what is immediate jeopardy that differs from the particular harms here? Immediate jeopardy is serious injury, harm, impairment, or death, or the probability. That's not what the term immediate jeopardy suggests. Well, that's the definition that CMS and all nursing homes in the industry uses. Is that the government's? That's the government's definition of it, Judge. OK. OK, that's fine. We'll have to hear from your opponent. Mr. Brooker? May it please the court, my name is Mark Brooker. I am appearing on behalf of the I think that what may be getting lost in the case is the potential harm from the abuse that the ALJ found to have occurred towards resident 34. Resident 34 was a 92-year-old man who needed assistance of two people for all activities of daily living, which means that he was helpless. And that the person who was rough with him is one of the people that he has to depend on to eat, to go to the bathroom, to go anywhere. And that's not someone that he could avoid. Rosewood's statement of issues in its brief talks about whether or not the failures of investigation and reporting amounted to immediate jeopardy. And that's also what has been brought up today. But it doesn't mention the harm or potential harm to this resident from the abuse that the ALJ found to have occurred. Rosewood's main argument against there having been any likelihood of harm from this incident is that the judge, the ALJ, should not have credited the allegation. But there's ample evidence in the record to support the judge's finding. And there's no reason to overturn his credibility findings. Well, your opponent's principal argument is that immediate jeopardy has been defined by the government in a way that's very narrow. You have to endanger a person's life or something like that. So, how does that apply here? Now, maybe for this unfortunate senile person, he's probably very vulnerable. I see that. But with the rings, we don't know much about, well, we're not told much about the rings. Were they valuable? The record doesn't contain evidence on the value of the rings. Of course, rings can have enormous sentimental value. Were these rings worn by the patient? Well, we don't know that. We don't know that either. We just know that they went missing. As far as the kissing incident, as it's called, and the missing rings go, the import of that is not that the particular residents there necessarily were endangered. It's that these are illustrations of a systemic breakdown in the policies of the facility for investigating and reporting abuse. The statement of deficiencies does not cite the facility for misappropriation of resident property for the rings incident. The problem was that they waited days to start the investigation after the resident had died, and it would be very the, with the kissing incident. Again, the import of that is that it was not reported and it was not, there was not a proper investigation or something approaching a proper investigation until after the survey had started. It was alleged to have occurred on May 2, 2014, and it was not until May 14, after the survey had started, that there was a report submitted, and that report was just talking to some people and saying, I didn't see anyone kiss him. Didn't see what? The report contained some statements from staff members saying that they had not seen anyone kiss the resident, and so the conclusion was... I don't understand the kiss. I mean, why that should be considered abuse? Well, the... Who minds being kissed? I don't understand that. Well, there's kissing that can, that can cross personal boundaries. The facility says it was a congratulatory peck on the cheek, but the actual allegation was that this was... So the person, the nurse who kissed him was a woman? Yes. So this old guy probably doesn't get a lot of kisses, right? He's probably delighted. First time he's been kissed in ages. Well, it was his wife who complained, right? It was his wife who brought the... It's a little complicated. Oh, I see, of course. Administrator's attention. Jealousy. Yeah, all right. Now I understand. Was this also a dementia patient? No, no. He was alert and oriented. I'm sorry? He was alert and oriented. A rehab patient? Was he in skilled nursing? Yes. Okay. The report from the facility said that he was alert and able to testify. But another point I would like to mention... And did he say that he was confused by this affection? Yes. He said he was... It shocked him and disturbed him. Okay. It what? It shocked him? Shocked him and disturbed him. Okay. Another point I would like to make as far as the implementation of the policies go, the numerous failures to follow the policy creates a reasonable inference that the policies were not implemented. And it's not just three incidents. For instance, with regard to resident 34, there were a series of failures to follow the policy. It not being reported to the administrator immediately. The CNA not being taken off duty pending the investigation. The second nurse it was reported to, delaying in reporting it to the administrator. The administrator not keeping the family apprised of the investigation. There's a whole list of policy violations. But wouldn't it be, getting back to the kissing, wouldn't it be better just to tell the nurse, this is unprofessional. You shouldn't be kissing the patient. It's unprofessional. I don't know that that would require a fine. I mean, presumably, you'd like these mistakes by staff to be corrected in some way that minimizes the consequence. And you'd think if they just said to the nurse, you know, you may think, you know, you're making them happier or, you know, signifying approval to them. But we regard it as unprofessional conduct. Wouldn't that take care of it? That would take care of it, certainly, under the facility's description of what happened, where it was just a peck on the cheek. But the kissing on both cheeks and the forehead, that is something that would naturally, I think, make someone uncomfortable. Rosewood brings up its training records, its end service records, as far as showing that its policies were implemented. We would argue that this argument has been waived. Rosewood did mention this in its pre-hearing brief before the ALJ, but not in the main brief before the ALJ, the briefs to the DAB, or, most importantly, in its opening brief to this Court. Well, as I understand the holdings by the agency, though, both the ALJ, I mean, the initial finding and then the ALJ's determination and the Appeals Board's determination, it's not really focused on a failure of training. It's focused on a failure of post-hoc investigation of alleged reports of abuse or rules violations, theft, et cetera, and a failure to promptly follow up on those reports and take them seriously. That's certainly true, and one of the reasons is that that argument was not brought up before the DAB. It might have addressed it in that case, but since it wasn't, the agency did not get a chance to speak on it. But certainly, the Secretary's position is that the multiple failures to follow the policy... Right. I'm not making a procedural point about waiver. I'm making a point about what the substantive basis for the findings by the agency was, and it's not you don't have adequate in-service. It's that you don't follow up adequately when there's a report of some kind of misconduct. Yes. I mean, that's the gravamen of the offense or offenses in the serious jeopardy or immediate jeopardy finding. I would agree with that, Your Honor. What is Rosewood's history of violations? I'm not sure that they have a necessarily bad history, but the question that's on appeal is whether this particular violation... I understand. I'm just curious. Mm-hmm. What is the effect in the industry of the imposition of a sanction of this magnitude? Well, we think it conveys the message that allegations of abuse have to be taken seriously. And as far as the magnitude of the CMP, we would say that all that's at issue here is whether it was immediate jeopardy and whether it properly fell within that range, because there's a specific process for the facility to challenge reasonableness of CMP within the range, and it didn't follow that as the DAB... Well, elaborating on Judge Sykes's question, do we know anything about the financial size or strength of Rosewood? I don't believe that there is, that there's information in the record on that, but that is something that the facility is supposed to introduce evidence on if it contends that the CMP would endanger its business or something like that. That would be something it could say, that this is a crushing fine because we're small? Yes, that is something. And they didn't bring that up? Yes, the letters imposing the remedies say that... lists various documents that they can submit to show that they would be able to bear the fine. Well, and a different import of my question was not Rosewood's ability to pay this fine, but the impact on its reputation. If this is an otherwise well-run facility, well-administered facility, the getting tagged with a fine of this magnitude, this category I'm talking about, not the size of the fine, but the category of the fine, the immediate jeopardy classification has an impact on its reputation. Does it not? Yes, it does, because we think it's accurate information that people would take into consideration if they want to... Is this proportionate to other immediate jeopardy findings across the industry? I mean, you do this work regularly, right? Yes, I do. I would say that this is in the... Is this a weak case, a strong case, in the middle? I would say it's a strong case. I've seen certainly worse abuse, but we think it's, you know, a solid example of abuse that clearly could have caused, especially this Resin 34, serious harm. To begin these proceedings, the CMS has to find what probable cause, what's the standard they use to find a violation? In the... Below, CMS has to make a prima facie case, and then the... ALJ, how does he review that finding? What is his standard in reviewing the finding? The ALJs is making a de novo, you know, plenary review of whether the evidence presented to the hearing process gives enough evidence to support the findings, except with regard to the severity level, which the facility has to come forward with evidence to show the severity level was... This is before the ALJ? That's before the ALJ. Okay, and what's on the next level, what's the standard of review? Okay, at the DAB, the standard of review is substantial evidence for factual questions and de novo for questions of the law. So you don't have to show an awful lot at any of those administrative levels to make this stick, do you? We would agree that with the... That it's difficult to overturn severity levels, and... But we believe it's appropriate, that it's natural for the agency to have wide discretion in determining the appropriate remedies. And if it comes to us, then at the end, the inquiry is kind of, well, I guess the administrative process kind of sort of had it right. I mean, there's never any really plenary, deep, deep look at what happened or... Is there? Not... All the way along. There's not a real de novo look at the severity level at any stage, but... But I'm sorry, you told me, you did tell me what the standard for the ALJ was on severity, and it's escaped me, I'm sorry. Yes, the burden of proof there is that the facility has to introduce evidence showing that the severity level is clearly erroneous. So as a practical matter, when that inspector comes in and says, this is a violation and this is the severity level, it's going to stick? Usually it does stick, but not always. The case that Grace Healthcare been cited Spring Meadows, that's an example where it didn't stick. I see my time is up. If there are no further questions... Thank you. Thank you, Mr. Speaker. Mr. Mayor? A couple points, Judge Posner, to you. We're not pleading poverty in this case. So I agree with Mr. Booker. If, in fact, the fine is so crushing it puts us out of business, we have an avenue to say to the CMS this isn't right. That's not what happened in this case, and we're not pleading poverty. I do want to point out that this waiver argument to me doesn't seem to have any merit. CMS in their own exhibits, which is Exhibit 8, gives our facility history because that's something they have to consider in imposing the fine. Clearly, if the theory is that we failed to implement our abuse and neglect policies, the fact that our history shows no problems with abuse and neglect, and our exhibits which show how we implement that policy and how we constantly remind our employees about that abuse and neglect policy, they're in the record and have not been waived. I want to go back to R34 because I agree with, and I think the panel says, that's the problem in this case, what happened with R34. Both Judge Kessel and the DAB say that R34 was harmed in some measure. They don't say how it was harmed or what the extent of that harm was. So, Judge, back to your question, how do we unstick that? Well, it's almost impossible for us to unstick it if the theory is, all we have to do is show some kind of harm, and therefore our decision about an immediate jeopardy is always warranted. And that's why grace is important because it says, you have to look at the facts of the particular circumstances to determine whether or not the harm or the likelihood of harm caused to those residents rises to the level of immediate jeopardy. But what does immediate jeopardy mean, though? Is this a term found in, I mean, has any, do we know the origin of the term immediate jeopardy? It's part of the older regulations, Judge, and I would cite you to the brief where there's a, my brief in the appendix, where there's a scope and severity grid which shows the level of violation, the letters they give, and what it is. So like, for instance, actual harm means serious injury or the likelihood of serious injury to residents. A G-level deficiency is actual harm that doesn't rise to the level of immediate jeopardy. Okay, but is the term immediate jeopardy defined to mean there has to be the dangers of a severe injury? Yes, it says it's either actual harm of a severe nature, impairment, death, or the likelihood of those instances. So any deviation, to follow CMS's reasoning, any deviation from an established policy and procedure has the potential to be cited at an immediate jeopardy level. Well, how do you unstick that problem? You say, well, wait a minute. The harm you're complaining of is not really serious injury, and it doesn't show the examples you showed. No, no, I know, but you yourself said, when you talk about immediate jeopardy, you're talking about a likelihood. So you can have an action by a nurse or something that doesn't actually cause an injury, a serious injury, but there was a likelihood of an injury. And the nurse and the patient were lucky it didn't materialize, right? But if likelihood is the test, it doesn't have to materialize. There just has to be a significant danger. Judge, let me answer it this way. Take the court's own decision in Fairfax. Fairfax, there were a number of incidents with residents on ventilators who are obviously high-care residents. And the decision was, well, look, you've got so many incidents of problems when you're taking care of these persons with ventilators that it's clear that that poses the likelihood of harm to these residents. What you have in this case is three isolated incidents, which occurred over a five-month period, one of which was not investigated by the Department of Public Health until they came in. One, the kissing incident, which wasn't an incident of abuse. Yeah, well, that's trivial. And then this incident with R34, which the ALJ found and the DAB found was harm in some measure. But there's no analysis of whether that harm rises the level of serious injury, harm, or impairment, or the likelihood. There's no discussion of likelihood by the government officials? The discussion is, because we failed to implement our policy, that makes the likelihood of harm to all the residents in the facility a probability. And we say no, we insert respect. Okay, well, thank you very much. Thank you. Thank you to both Council. The next case.